**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ROBIN COLLYMORE,

        Plaintiff,

        -against-

CITY OF NEW YORK; LISA MALUF; MATTHEW
AUSTIN; and DAVID KIRKS in their individual
capacities and as aiders and abettors.

        Defendants.

INDEX NO.: 16-CV-8270(LTS)

**AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

        Plaintiff ROBIN COLLYMORE ("COLLYMORE" OR "PLAINTIFF"), by and through

her attorney, Special Hagan, Esq., complains of Defendants City of New York ("City"), Matthew

Austin ("AUSTIN"), David Kirks ("KIRKS"), and Lisa Maluf ("MALUF") as follows:


## I.   INTRODUCTORY STATEMENT

1. This is an action for discrimination based on race, gender, hostile work environment,

    cronyism and retaliation.  Plaintiff, a 54 year old African American woman, worked as a

    Project Manager for the Department of Information Technology and Telecommunications'

    ("DoITT") Emergency Communications Transformation Program ("ECTP").  Initially,

    Plaintiff experienced unwanted touching and physical contact from her manager Lisa Maluf.

    Plaintiff complained in multiple fora: DoITT's EEO Office, KIRKS, Labor Relations, her

    union representative and the Equal Employment Opportunity Commission ("EEOC").  In

    each instance, nothing was done to stop MALUF's behavior and in the wake of her

    complaints her environment became rife with retaliation, hostility discrimination and abuse.

2. Plaintiff also experienced retaliation when she complained of unethical and or corrupt

1

conduct to then Deputy/Associate Commissioner, David Kirks. Plaintiff's unit, the
Emergency Communications Transformation Program ("ECTP") was under ongoing
monitoring from the Department of Investigation ("DOI"). A number of widely publicized
scandals and the failure to complete two Public Safety Answering Centers ("PSAC") on
schedule and within budget, prompted Mayor Bill DeBlasio to order an investigation of the
ECTP.

3. As such, throughout Plaintiff's employ at DoITT, periodically, DOI would request
documents and engage ECTP staff. In the midst of DOI's ongoing monitoring efforts, in or
about December 2015, AUSTIN verbally instructed Plaintiff and staff to hide documents
from DOI. Plaintiff was concerned and initially reported AUSTIN to Myles Driscoll
("DRISCOLL"), Director of the agency's Office of Labor Relations and Discipline; Plaintiff
also initially complained to her union representative. In response to her complaints to the
aforementioned, in both instances, she was either ignored or told that she was mistaken.
However, in the wake of these complaints about AUSTIN, she experienced even more
harassment and retaliation from AUSTIN and MALUF.

4. From January 2016 to June 2016, Plaintiff's work environment became even more hostile,
discriminatory and retaliatory. Due to the stress and abuse at the job, Plaintiff began to
experience increased numbers of migraine headaches and began to miss more and more days
from work. During the aforementioned period, Plaintiff filed a formal charge with the
EEOC, the agency's EEO Office and finally KIRKS.

5. On June 22, 2016, as a last resort, Plaintiff complained to KIRKS due to the ongoing
violations of her civil rights, the pressure to hide information from DOI and her deteriorating
health. Plaintiff told KIRKS about MALUF and AUSTIN and the violations of the CITY's

EEO Policy.  She also told KIRKS about AUSTIN's directive to hide documents from DOI. In the latter instance, from KIRKS's expression, it was clear he knew about AUSTIN's directive –as such, he did nothing.

6.   Within days of her complaint to KIRKS, AUSTIN intensified his behavior. It was apparent from AUSTIN's increased and continued misconduct, and KIRKS' failure to act that he tacitly approved of not only the violation of the City's EEO Policy, but AUSTIN's instructions to hide documents from DOI.  It was at this point that Plaintiff realized she worked in an environment rife with discrimination, retaliation and cronyism.  Therefore, on June 28, 2016 six days after her complaint to KIRKS about discrimination, retaliation and corruption, COLLYMORE was constructively discharged and resigned.  COLLYMORE resigned not only to avoid any possible implication in KIRKS's scheme to hide documents from DOI, she also resigned to preserve her health.   Within four months of her resignation from DoITT, Plaintiff discovered that she had a brain aneurysm.

7.   Plaintiff experienced further harassment from the named Defendants in the wake of her resignation.   After Plaintiff resigned from DoITT, she applied for Unemployment Insurance (UI).   Plaintiff contends that Defendants intentionally allowed her to collect unemployment insurance for the full time for which she was entitled, and then sought to challenge her collection of those benefits.   Upon information and belief DoITT has never challenged an employee's collection of UI benefits under such circumstances.   Specifically, the individually named Defendants all attended the UI hearing for the sole purpose of intimidating Plaintiff and as a further act of harassment.

8.   Accordingly, Plaintiff alleges that she experienced a continuing violation of her rights under the law and was thereby constructively discharged.   Plaintiff thereby brings this action

because the terms, conditions, and privileges of her employment relationship with Defendants have been adversely affected under: The First and Fourteenth Amendments of the United States Constitution; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq. ("Title VII"); 42 U.S.C. §§ 1981 and 1983; the New York State Human Rights Law, Executive Law § 296 et. seq. (the "Executive Law"); and the Administrative Code of the City of New York, § 8-107 et. seq. (the "City Law").

9. Plaintiff thereby seeks declaratory judgment, compensatory and punitive damages, as well as any other appropriate relief.

## II.  JURISDICTION & VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 to secure protection of and to redress the deprivation of rights secured by 42 U.S.C. §§ 1981, 1983 and 2000e.

11. This Court has supplemental and pendant jurisdiction pursuant to 28 U.S.C. § 1367(a) over the Plaintiff's state and city law claims arising under the New York State Executive Law and the New York City Administrative Code respectively, because the Plaintiff's federal, state and city claims derive from a common nucleus of operative facts and form part of the same case and controversy.

12. Venue is proper under 28 U.S.C §§1391(b)(1) and (c) because:  Defendants maintain offices and conduct business in this district and Plaintiff resides in the Southern District of New York.

13. Plaintiff's action for declaratory relief is authorized by 28 U.S.C. §§ 1343, 2201 and 2202.

## III. PROCEDURAL REQUIREMENTS

14. Pursuant to § 8-502(c) of the City Law, COLLYMORE served a copy of this complaint on

4

the New York City Commission of Human Rights and the Corporation Counsel of the City of
New York.

15. COLLYMORE filed a charge of discrimination with the Equal Employment Opportunity
Commission ("EEOC") on or about July 5, 2016 (EEOC Charge No. 520-2016-02845).  On
or about July 25, 2016, a "Notice of Rights" was issued by the EEOC.   COLLYMORE
initiated this lawsuit on October 23, 2016, and has thereby fully complied with the
administrative prerequisites.

## IV. PARTIES

16. COLLYMORE is a resident of New York County, New York.

17. COLLYMORE is an African American woman.

18. Plaintiff worked at DoITT as a Project Manager for the Emergency Communications
Transformation Program ("ECTP") from August 3, 2015 to June 28, 2016 when she was
constructively discharged and resigned.

19. Defendant City of New York ("CITY") is a municipal corporation organized and existing
under and by virtue of the law of the State of New York, and at all times relevant was
Plaintiff's employer.

20. Under the Charter of the City of New York, the CITY is the municipal agency charged with
the responsibility for its duly organized and created departments, including the Department
of Information Technology and Telecommunications ("DoITT") and the CITY's agents,
servants, and employees who work for DoITT.

21. The CITY is an employer as well as a public employer and state actor within the meaning of
federal, state and city statutes, including but not limited to Title VII, Sections 1981 and 1983,
the New York Executive Law, the New York Civil Service Law, and the New York City

Administrative Code.

22. Defendant CITY/DoITT is and was a municipal agency created and authorized under the laws of the City of New York.  Accordingly, DoITT provides infrastructure and telecommunications (IT) services to New York City's agencies, boards, offices, residents, businesses and visitors.

23. As a City agency, DoITT is an employer as well as a public employer within the meaning of the applicable federal, state and city statutes, including but not limited to Title VII, Sections 1981 and 1983; the New York Executive Law; the New York Civil Service Law; and the New York City Administrative Code.

24. At all times relevant, COLLYMORE was CITY's/DoITT's "employee" within the meaning of all applicable federal, state and city statutes.

25. At all times relevant hereto, Defendant David Kirks("KIRKS") was employed by CITY and DoITT.  For all times relevant, KIRKS was Plaintiff's indirect supervisor.   For all times relevant, KIRKS served as Associate Commissioner and Director of ECTP for DoITT.

26. KIRKS has substantial policy making authority as defined by the New York City Charter; and has the ability to make personnel decisions and disciplinary decisions.  In his capacity, KIRKS was also the final decision-maker when it came to disciplinary and training matters in the unit; all managers who sought to discipline staff also had to obtain KIRKS's approval. KIRKS is sued here in both his individual and official capacities.

27. At all times relevant hereto, KIRKS: actively and directly participated in the unlawful discriminatory and retaliatory conduct directed at Plaintiff; failed to ensure that non-discriminatory working conditions were provided; and or ratified or condoned the conduct alleged herein.

28. Upon information and belief KIRKS has an annual salary of approximately $189,614 and has been promoted to Deputy Commissioner despite the fact that Public Safety Answering Center 2 (PSAC-2) is not fully operational (i.e. "gone-live").

29. KIRKS is a Caucasian male, is sued in his individual and official capacities; he is also being sued as an aider and abettor.

30. At all times relevant hereto, Defendant Matthew Austin ("AUSTIN") was employed by CITY and DoITT.  For all times relevant, AUSTIN was Plaintiff's direct supervisor.   For all times relevant, AUSTIN served as Director of ECTP Project Management at DoITT/CITY.

31. AUSTIN has substantial policy making authority as defined by the New York City Charter; and AUSTIN also has the ability to make personnel decisions.  AUSTIN is sued here in both his individual and official capacities.

32. At all times relevant hereto, AUSTIN: actively and directly participated in the unlawful discriminatory and retaliatory conduct directed at Plaintiff; failed to ensure that non-discriminatory working conditions were provided; and or ratified or condoned the conduct alleged herein.

33. Upon information and belief AUSTIN has an annual salary of approximately $157,190. Upon information and belief, AUSTIN has three degrees from Full Sail University, an institution that issues online degrees.

34. AUSTIN, a Caucasian male, is sued in his individual and official capacities; he is also being sued as an aider and abettor.

35. At all times relevant hereto, Defendant Lisa Maluf ("MALUF") was employed by CITY and DoITT.  For all times relevant, MALUF was Plaintiff's indirect supervisor.   For all times relevant, MALUF served as Deputy Program Manager for the ECTP at DoITT.

36. MALUF has substantial policy making authority as defined by the New York City Charter; and has the ability to make personnel decisions.  In her capacity, MALUF was also the final decision-maker when it came to disciplinary and training matters in the unit; all managers who sought to discipline staff had to obtain MALUF's approval.  MALUF is sued here in both her individual and official capacities.

37. At all times relevant hereto, MALUF: actively and directly participated in the unlawful discriminatory and retaliatory conduct directed at Plaintiff; failed to ensure that non-discriminatory working conditions were provided; and or ratified or condoned the conduct alleged herein.

38. Upon information and belief MALUF has an annual salary of approximately $161,154. Upon information and belief, MALUF has been a Chief of Staff and President of a Business Improvement District prior to her work at DoITT, which started in April 2010.

39. MALUF, a Caucasian female, is sued in her individual and official capacities; she is also being sued as an aider and abettor.

40.  At all times relevant, Defendants acted under color of the statutes, ordinances, regulations, customs and usages of the Constitutions of the United States and New York; Defendants also acted under the authority of their respective positions or offices.

## V.  FACTS

**BACKGROUND INFORMATION**

41. COLLYMORE is a Certified Project Manager with over 25 years of experience in the private sector.

42. Prior to working for CITY/DoITT, COLLYMORE had a distinguished career at American Express ("AMEX"), where she was promoted in salary and title on at least five occasions.

43. Plaintiff learned of DoITT upon her departure from AMEX. Around that time, she read about the ECTP, which had been plagued by years of scandal, cost overruns and a failure to deliver the PSAC-2, a second Public Safety Answering Center to be located in the Bronx.

44. After an initial failed attempt to modernize the City's emergency response systems in the 1990s, the Bloomberg administration implemented the Emergency Communications Transformation Program ("ECTP") in 2004.

45. ECTP's primary goals were: to integrate the emergency response functions of the three agencies (NYPD, FDNY/EMS) into a single facility at a renovated Public Safety Answering Center (PSAC), PSAC-1; create PSAC-2, a second facility that would serve as a backup in the event of an emergency or disruption of service at PSAC-1; modernize the E911 telecommunications network; and implement a new Computer Aided Dispatch ("CAD") system for the NYPD, FDNY and the FDNY's Emergency Medical Services Division ("EMS").

46. In 2004, the Bloomberg administration projected that the ECTP would accomplish its objectives within 5 years with a budget of $1.3 billion.   However, a series of scandals that involved Hewlett Packard, the vendor responsible for building PSAC-1, mismanagement and cronyism all contributed to a failure to complete PSAC-2 or any of the other goals enumerated in ECTP's mandate.

47. After numerous newspaper articles that detailed corruption, mismanagement and cost overruns involving the ECTP, in March 2012, Comptroller John Liu conducted an audit of the program.

48. Comptroller Liu's audit resulted in three findings, all of which DoITT agreed were correct and vowed to address.  Chief amongst those findings was that, "DoITT should increase its

efforts to fill open positions with appropriately qualified personnel to ensure that the ECTP

has sufficient resources required for the ongoing monitoring and management of the ECTP."

49. Nevertheless, despite these findings, DoITT continued to engage in cronyism and continued

to maintain its management structure beneath the Commissioner level.

50. Despite a failure to produce a fully operational PSAC-2, the CITY allowed MALUF,

AUSTIN and other highly paid, politically connected Caucasian employees to remain in

place, despite the fact they lacked educational and or professional backgrounds and

experience in project management and emergency response programs.

51. On May 19, 2014 Mayor DeBlasio ordered a halt to work on the City's ECTP, pending a

comprehensive investigation and review by the City's Department of Investigation ("DOI")

and the new City Comptroller.   In an effort to address the findings, DoITT began to

aggressively hire employees to fill vacancies within the unit.

52. Since COLLYMORE was no longer at AMEX and had been following what was going on

with ECTP, she saw an opportunity to join what she believed would be a team of skilled

professionals. She believed that ECTP would be an excellent opportunity to further her

extensive experience in risk and project management in the public sector; COLLYMORE

believed she could be an asset to the team and sought a position within the unit.

53. COLLYMORE started work at DoITT/CITY on August 3, 2015 at a salary of 112,000.

54. COLLYMORE was a provisional employee, and had the Civil Service Title of Computer

Software Specialist.

55. Plaintiff's functional/office title was Training Project Manager.  Accordingly, with over 25

years of experience, COLLYMORE was qualified for the position she held at DoITT.

56. As an ECTP Training Project Manager, COLLYMORE performed a number of functions in

Project, Agency Relationship and vendor management.

57. In their transition to a singular emergency response system, NYPD, FDNY/EMS would engage a number of vendors and would require training on a number of platforms. Accordingly, as Project Manager for training, COLLYMORE would engage the various stakeholders, take their complaints and engage in any other quality or project management necessary consistent with the Project Management Body of Knowledge (PMBOK) and DoITT's published project management methodologies.

58. As a Project Manager, COLLYMORE oversaw training for the NYPD and FDNY.   She was the facilitator between DoITT, the aforementioned agencies and the vendors that was providing training on the new software platform.

59. In general, it was COLLYMORE's job to make sure that training was seamlessly provided, that the materials were there for the trainees, that the training sessions were scheduled and that the training sessions took place in a timely fashion.

60. In addition to her responsibilities for the ECTP, AUSTIN also farmed COLLYMORE out to the Maintenance Group (IMS group).   COLLYMORE worked with DoITT staff member Rachel Cruz (CRUZ), in order to ensure that DoITT staff also received training on the software platform.   However, this part of her work was not part of the ECTP program and was outside of COLLYMORE's job description.

61. Nevertheless, in the beginning, Plaintiff was excited about her job and COLLYMORE eagerly engaged management and key stakeholders.   However, Plaintiff's feelings towards her job began to change within the first month.

### Hostile Work Environment/Sexual Harassment

62. MALUF was also Plaintiff's supervisor, MALUF was Deputy Program Manager of the

ECTP and was over Plaintiff's direct supervisor AUSTIN. In her capacity as Deputy Program Manager, MALUF acted as a chief of staff of the ECTP group. She coordinated administrative activities, regularly engaged staff one on one and organized unit activities. Accordingly, initially MALUF and Plaintiff regularly met one on one.

63. COLLYMORE experienced unwanted touchings from MALUF at these one on one meetings. At any given time MALUF would: touch and rub Plaintiff's arm, pat Plaintiff's leg, rest her arm on COLLYMORE's back and or grab her hands and legs. MALUF's unwanted touchings would happen repeatedly over a period of time.

64. Initially, COLLYMORE would position herself so that MALUF wouldn't touch her. Plaintiff would also put objects and furniture to impede MALUF's ability to contact her; Plaintiff would also physically distance herself from MALUF –all to no avail. MALUF would simply re-position herself and would proceed to grab and touch Plaintiff.

65. In or around September 2015, Plaintiff told MALUF that she did not like being touched.

66. Despite Plaintiff's initial complaint, MALUF ignored Plaintiff and continued to touch her.

67. COLLYMORE then began to complain to other staff about MALUF's touching. At which point, she learned that MALUF regularly touched others the same way, and that a number of employees had complained about MALUF's touching –again to no avail.

68. To be clear, despite multiple complaints to management about MALUF's unwanted touchings, DoITT consistently failed to discipline MALUF or to take any other substantive steps to address her behavior.

69. Immediately after COLLYMORE complained to MALUF about the unwanted touchings, COLLYMORE's work environment became hostile. Her blood pressure increased, she began to experience more migraines and she began to miss work.

70. In the wake of her complaint, AUSTIN, MALUF'S subordinate and COLLYMORE's direct supervisor, began to harass PLAINTIFF along with MALUF.

71. MALUF and AUSTIN began to scrutinize COLLYMORE's work more closely than other staff members in the office.   On a daily basis, AUSTIN would check on COLLYMORE's whereabouts via emails and other means.

72. One of the more egregious incidents of AUSTIN'S harassment took place when COLLYMORE volunteered to work at the Pope's appearance.  Although COLLYMORE complied with protocol and indicated her whereabouts on her shared electronic calendar, AUSTIN harassed her throughout the day and reported her AWOL.

73. The Pope event was one of many where AUSTIN unjustifiably attacked Plaintiff.  When AUSTIN learned of COLLYMORE's whereabouts, he withdrew the AWOL designation from Plaintiff's timesheet.

74. Plaintiff also complained about MALUF to the agency's EEO Office and agency management.

75. When COLLYMORE made the EEO Complaint, MALUF and AUSTIN intensified their discriminatory and retaliatory behavior.

76. At this time MALUF and AUSTIN became aware of Plaintiff's migraines.   MALUF and AUSTIN also knew that Plaintiff had to eat lunch at a prescribed time because of her condition.  However, MALUF and AUSTIN would insist that Plaintiff work through lunch when they had meetings; they would also insist that Plaintiff schedule meetings during her lunch hour.

77. MALUF and AUSTIN insisted that COLLYMORE work thru lunch with full knowledge that COLLYMORE would become ill.  Due to their insistence that COLLYMORE work through

lunch, COLLYMORE developed migraines on a regular basis.  As a result of the regular and increased stress and harassment from MALUF AND AUSTIN, COLLYMORE began missing more and more days from work.

78. AUSTIN would also begin to sabotage COLLYMORE's work.

79. The ECTP unit would have weekly meetings where staff would present slides.   Prior to the meetings, staff members uploaded slides to the unit's shared drive. Unlike the other staff however, AUSTIN would delete Plaintiff's slides so that she could not present at the weekly staff meetings.

80. AUSTIN would then chastise COLLYMORE for not uploading the slides in a timely manner. Similar to other people who identified as minorities in the unit, AUSTIN went after COLLYMORE because she was Black and because of her EEO complaint against MALUF.

81. COLLYMORE would also experience verbal attacks from MALUF at the weekly staff meetings.  After one vicious attack by MALUF in front of a group of people, another staff person by the name of Rick Brunner (BRUNNNER) came to COLLYMORE's defense. BRUNNER, a white male stated that MALUF had attacked COLLYMORE for completing her work ahead of schedule.  On that occasion, BRUNNER pointed out to MALUF that she had never chastised any other managers for completing work ahead of schedule; again COLLYMORE is Black and the other managers who presented were white.

82. On another occasion MALUF and AUSTIN attacked COLLYMORE when she requested $900 to obtain a projector.  COLLYMORE attempted to make a presentation at the weekly staff meeting for the projector, but was peppered with hostile questions throughout from MALUF and AUSTIN.  When COLLYMORE finally finished her presentation, MALUF joked that they spent a great deal of time with the questioning despite the fact that the request

for the expenditure was small in comparison to the unit's spending.  MALUF and AUSTIN's behavior were attributable to COLLYMORE's race and her complaints of discrimination, ethical violations and retaliation.

83. Ultimately, because of her complaints and her race, MALUF and AUSTIN would take every opportunity to silence and humiliate COLLYMORE, especially at weekly staff meetings. At this juncture, MALUF and AUSTIN sought to silence and humiliate COLLYMORE because of her complaints and because of their racial animus.

84. Eventually, COLLYMORE's work environment became so intolerable due to the stress, that she began to experience migraine headaches with greater frequency.  As a result, COLLYMORE also began to miss more and more days of work.

85. Prior to her time at DoITT, COLLYMORE did not experience migraines as frequently. However, due to the harassment she experienced under AUSTIN and MALUF, the frequency of her migraines increased in number and intensity.

86. In fact, the stress from the harassment she experienced from MALUF and AUSTIN would lead to migraines that were so debilitating and frequent that COLLYMORE was constructively discharged.  COLLYMORE resigned not only because of the ethical violations she identified in the unit, she also resigned because of her health.

87. Again, within four months of her resignation from DoITT, COLLYMORE was diagnosed with a brain aneurysm.

88. However, AUSTIN and MALUF's harassment did not stop once COLLYMORE resigned. AUSTIN, MALUF and DoITT would continue to harass COLLYMORE when they fought against her receipt of Unemployment Insurance.

89. In an unprecedented move, AUSTIN and MALUF, both executive level staff, personally

attended COLLYMORE's unemployment insurance hearing to intimidate her.

90. To date, DoITT has never had Assistant Commissioners attend an unemployment insurance hearing to contest an employee's receipt of unemployment benefits.

91. In a further act of hostility, DoITT intentionally waited until after COLLYMORE received all of the unemployment insurance benefits she applied for to contest her application.  As such, due to DoITT's intentional failure to contest Plaintiff's application in a timely fashion, COLLYMORE may be liable for thousands of dollars of benefits.

92. To be clear, DoITT could have contested COLLYMORE's application after she received her first Unemployment check, but instead DoITT waited until she received thousands of dollars of benefits.

**AUSTIN's Disparate Treatment, Harassment and Abuse**

93. MALUF and AUSTIN's behavior towards COLLYMORE was also indicative of their racial animus towards COLLYMORE and other racial minorities who worked in the ECTP.

94. COLLYMORE would eventually learn from other staff within the ECTP, that AUSTIN and MALUF had animus towards racial minorities.  Specifically, Gene Yurman (YURMAN) told COLLYMORE that AUSTIN had issues with black employees and that he did not treat white staff the same way.

95. COLLYMORE and staff who identified as racial minorities such as Vera Olave (OLAVE) would be: denied training; their work would be more closely scrutinized; they would be paid disproportionately less than their white counterparts for performing similar job functions; and they would be attacked by AUSTIN and MALUF both in writing and in group meetings.

96. When COLLYMORE would speak at staff meetings, AUSTIN would interrupt her and brusquely state that they weren't doing things that way.  However, when white employees

would speak, AUSTIN was receptive and would not interrupt them.

97. COLLYMORE was paid at a comparable rate as her white counterpart in the unit Jeanine
   Donohue (DONOHUE). DONOHUE AND COLLYMORE perform similar job functions
   despite the disparities in their professional experience and educational backgrounds.

98. DONOHUE and COLLYMORE were managed by KIRKS, AUSTIN and MALUF, were
   subject to the same evaluation process, were required to engage the FDNY and the same
   vendors, and were required to make weekly presentations to the aforesaid managers.

99. Despite these similarities, there are disparities between COLLYMORE and DONOHUE.
   COLLYMORE has a Master's Degree and over 25 years of Project Management experience;
   while DONOHUE a white female, has less project management experience and does not
   have a Master's degree.

100. DONOHUE was also treated better by AUSTIN and MALUF.  She was provided training
   and was not excoriated at staff meetings.  However, AUSTIN and MALUF regularly denied
   COLLYMORE's requests for training and regularly humiliated, yelled at, interrupted and
   sabotaged COLLYMORE at weekly staff meetings.

101. Overall, DONOHUE worked in the same unit as COLLYMORE, performed as a project
   manager, reported to MALUF, AUSTIN and or KIRKS, yet DONOHUE was treated better
   as a white employee than COLLYMORE.

102. AUSTIN and MALUF would permit Caucasian employees to work overtime without
   prior requests, both prior to and after the implementation of the unit's Overtime policy.

103. However, unlike the Caucasians in the unit such as Gene Yurman (YURMAN), MALUF
   and AUSTIN would either chastise COLLYMORE about her requests for overtime or deny
   them altogether; even when her work required that she work outside of her scheduled hours.

104.    YURMAN, however was allowed to work overtime even without advance notice.  He was also not berated by AUSTIN and or MALUF at staff meetings or in general.

105.    AUSTIN would also track the vendors that COLLYMORE spoke to, while he didn't do so for YURMAN and other white staff members he managed.

106.    Both YURMAN and COLLYMORE reported to AUSTIN, MALUF and KIRKS.

107.    YURMAN, a white male performed similar job functions to COLLYMORE, yet unlike COLLYMORE he was not abused by AUSTIN. AUSTIN also did not deny YURMAN overtime or scrutinize YURMAN's work like he did COLLYMORE.

108.    YURMAN and DONOHUE would receive responses to their inquiries from AUSTIN, while COLLYMORE would not be afforded that same treatment.  Instead as a Black woman, she was ignored by AUSTIN.

109.    AUSTIN would also openly and regularly abuse and ignore COLLYMORE, as well as other staff who identified as racial minorities at staff meetings.  At these weekly staff meetings, AUSTIN would posture and speak aggressively at COLLYMORE. He would be combative and dismissive with COLLYMORE while he would act professionally towards the white staff members in the unit.

110.    An example of AUSTIN's animus could be seen in how he treated COLLYMORE's queries.  On one occasion, COLLYMORE asked AUSTIN a number of questions about the tasks and standards.   AUSTIN refused to answer COLLYMORE despite multiple requests for clarification.  However, in front of the unit, at their weekly meeting, when white staff person John Dilworth (DILWORTH) asked the same questions, AUSTIN openly said that COLLYMORE posed the same questions and proceeded to answer DILWORTH in front of the whole unit after he ignored COLLYMORE.

111.    MALUF would also display her animus when she would attack COLLYMORE would at weekly staff meetings.  On those occasions, MALUF would yell at and attack COLLYMORE during her slide presentations.   MALUF would not do this to white staff, and as mentioned above sometimes MALUF's attacks would be so bad that white staff would intervene on COLLYMORE's behalf.

112.    AUSTIN would also seek ways to insure, that COLLYMORE and other racial minorities were not recognized by management.

113.    AUSTIN regularly removed COLLYMORE from agendas at the group's weekly meetings.   One notable occasion involved Rob Brauer (BRAUER), the Director of the Finance Department.

114.    Fully cognizant of the abuse COLLYMORE regularly sustained from AUSTIN and MALUF, BRAUER asked that COLLYMORE's request for the release for funding be placed on the agenda.

115.    By this time it was clear that as a white male BRAUER would get more respect from AUSTIN and MALUF, that he would be allowed to make the presentation without hostility and contention.  As such, BRAUER spoke on behalf of COLLYMORE, this was despite the fact that the request for release of funds should have been something that COLLYMORE discussed.  However, BRAUER and COLLYMORE agreed that the request had a higher likelihood of success if it was made by BRAUER, a white male.

116.    AUSTIN would also remove COLLYMORE from meetings with the FDNY.  However, although both COLLYMORE and DONOHUE both worked with the FDNY, AUSTIN never left DONOHUE out of the meetings.   AUSTIN would also withhold information from COLLYMORE and not DONOHUE.

117.    On multiple occasions, DONOHUE would ask COLLYMORE: "didn't Matt tell you about [a vendor] leaving?" or say "didn't Matt tell you….."

118.    AUSTIN would also sabotage COLLYMORE's work, say she didn't submit slides to be presented at the weekly unit meetings and would engage in any number of obstructionist tactics to prevent COLLYMORE from speaking at the weekly meetings. In response, COLLYMORE took to taking screenshots of her slides in order to prove that she submitted them in a timely fashion and according to the unit's protocol.

**Retaliation: DEFENDANTS Retaliate Against Plaintiff for Complaining about Discrimination**

119.    Plaintiff complained about sexual harassment to MALUF and agency staff in or about September 2015.

120.    In November 2015, AUSTIN yelled at Plaintiff during a 1 on 1.

121.    In or around November 2015, AUSTIN and MALUF changed Plaintiff's shift so that she could not request overtime.

122.    Upon information and belief, AUSTIN and MALUF do not change anyone else's hours.

123.    Upon information and belief, AUSTIN and MALUF do not deny any Caucasian employees overtime at this juncture.

124.    On January 1, 2016 AUSTIN wrote Plaintiff up for violation of the agency's Code of Conduct.

125.    Towards the end of January 2016, Plaintiff filed a charge of discrimination with the EEOC.

126.    Within days of her EEOC filing, AUSTIN yelled at Plaintiff in front of another staff person.

127.    Plaintiff filed a second EEOC charge in April 2016.

128.    Around this time, Plaintiff also filed an internal EEO complaint with DoITT's Office of
EEO, staffed by EEO Officer Kenneth Hunter (HUNTER) and Shaquiea Sykes (SYKES).

129.    Within weeks of her complaints MALUF yelled at COLLYMORE for completing her
work early.

130.    Between April and June 2016 both MALUF and AUSTIN would continue to harass
Plaintiff.   Both MALUF and AUSTIN would engage in nasty email exchanges with Plaintiff.
Both MALUF and AUSTIN would insist that Plaintiff work outside of her work hours
without compensation. Both MALUF and AUSTIN would deny Plaintiff training
opportunities that would lead to her professional development; they would exclude Plaintiff
from unit meetings; and would continue to deny her requests for overtime even when she
needed to work beyond her scheduled work day to accommodate vendors.

131.     On June 22, 2016, Plaintiff complained to KIRKS about a number of things including
discrimination.

132.    Immediately after her sexual harassment complaint, MALUF and AUSTIN intentionally
changed COLLYMORE's hours to avoid paying her overtime.

133.    Plaintiff went from working from 8AM to 4PM to 9AM to 5PM even though she would
sometimes be required to come in before 8AM and or stay beyond 5PM.

134.    In several instances, Plaintiff was required to come into work before her scheduled shift,
specifically to provide access to vendors who were providing training.   Plaintiff would
request overtime in those instances and she was either chastised and or denied by MALUF
and or AUSTIN.

135.    Again, when Caucasian employees managed by AUSTIN and MALUF were required to
work outside of their scheduled shifts, and sought overtime they were approved even without

submission of prior requests.

136.    The animosity between AUSTIN, MALUF and COLLYMORE became so intense that in

December 2015, AUSTIN yelled at Plaintiff in their one-on-one meeting.

137.    In or about January 2016, Plaintiff continued to experience migraines and missed work.

At which point she removed herself from projects that she volunteered on above and beyond

her tasks and standards. When AUSTIN found out that she had removed herself, he yelled at

her in front of other staff again.

138.    On both occasions, AUSTIN was in clear violation of the Agency's Code of Conduct.  As

such, she complained to KIRKS about the incident in January, she also complained to

KIRKS about AUSTIN's discriminatory conduct.

139.    COLLYMORE also complained to the agency's Director of Labor Relations and

Discipline, Myles Driscoll (DRISCOLL).

140.    KIRKS failed to adhere to the CITY's EEO policy and failed to take any further steps

regarding Plaintiff's complaint of discrimination.

141.    Additionally, despite witnesses, DRISCOLL failed to find that AUSTIN violated the

agency's code of conduct when he yelled at her on at least two occasions.

142.    After ongoing harassment, abuse and disparate treatment from AUSTIN and MALUF

Plaintiff filed her first charge of discrimination and retaliation with the EEOC.

143.    Despite multiple complaints to the agency's EEO Office, SYKES and HUNTER either

ignored COLLYMORE's complaints or refused to investigate them.

144.    Upon information and belief, DoITT's EEO Office had a custom or policy of ignoring,

failing to investigate and or failing to address the EEO complaints.

145.    Upon information and belief, DoITT's EEO Office failed to investigate, ignored or

addressed OLAVE's EEO complaint along with a host of other DoITT employees, as can be

seen in the City Commission of Human Rights Case filed by Karina Flete in 2013 where she

accused the EEO Office of ignoring her complaint.

**First Amendment Retaliation for Reporting AUSTIN's Instructions to Hide
Information about ECTP on the J:Drive**

146.   On or about December 7, 2015 AUSTIN conducted a meeting with Plaintiff and

approximately 15 other people.

147.   At that meeting, in clear violation of the Code of Conduct, AUSTIN instructed staff to

hide information about the ECTP, PSAC-1, PSAC-2 and Fire Department Computer Aided

Dispatch (FDCAD) initiatives from DOI during an ongoing investigation.  At that meeting,

AUSTIN told staff to put documents in the J: Drive since DOI had already searched that

drive and would not search it again.

148.   Plaintiff initially complained about the possible ethics and code of conduct violations to

her union representative Mike Lanni.   She then complained to Emily Johnson

("JOHNSON"), DRISCOLL and DC 37 on or about January 15, 2016.

149.   Despite being tasked with enforcing the Agency's Code of Conduct and ethics, neither

JOHNSON nor DRISCOLL took any steps to address Plaintiff's written complaint.

150.   From February 2016 to June 2016, MALUF and AUSTIN continued to harass and

discriminate against Plaintiff.

151.   MALUF and AUSTIN sought to bring her up on disciplinary charges after she reported

AUSTIN to her union representative and DOITT management.

152.   Since Plaintiff feared additional retaliation, she refrained from raising the issue again

until June 22, 2016.

153.   However, after months of abuse from AUSTIN and MALUF, again as a last resort she

complained to KIRKS about discrimination, retaliation and now AUSTIN's instruction to

hide documents from DOI.

154.    When COLLYMORE complained to KIRKS on this occasion, she observed from his

reaction that he already knew about AUSTIN's instructions to staff. She also sensed at that

juncture, that KIRKS had instructed AUSTIN to tell staff to hide documents from DOI.

155.    Upon information and belief KIRKS took no action to address Plaintiff's complaints

between June 22nd and June 28th.

156.    Within days of this last complaint to KIRKS, AUSTIN continued to harass

COLLYMORE.  AUSTIN would continue to scrutinize COLLYMORE's work and would

continue to insist that she work beyond her shift without compensation.

157.    Accordingly, when it became apparent that her health would continue to deteriorate if she

continued to work with AUSTIN and MALUF, and that KIRKS would not take any action to

address AUSTIN's unethical conduct, Plaintiff resigned.

## VI. CLAIMS FOR RELIEF

***PLEASE NOTE THE TITLE VII CAUSES OF ACTION DO NOT APPLY TO THE
INDIVIDUALLY NAMED DEFENDANTS, BUT JUST THE CITY OF NEW YORK***

### FIRST CLAIM FOR RELIEF
### SEXUAL HARASSMENT & HOSTILE WORK ENVIRONMENT
### In Violation of
### Title VII, 1981, NYSHRL, NYCHRL

158.    Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation

set forth in the foregoing paragraphs as if fully set forth herein.

159.    Plaintiff belongs to two protected classes; she is a woman and she is African American.

160.    Plaintiff repeatedly experienced unwanted touching from MALUF.

161.    Plaintiff verbally told MALUF to stop touching her.

162.    Plaintiff complained to staff and agency management.

163.    Plaintiff complained to agency's EEO Office.

164.    Plaintiff also experienced repeated verbal abuse, disparate treatment and harassment
based on her race.

165.    Upon information and belief, the individual Defendants directed and/or participated in
and or were aware of and failed to take immediate and appropriate corrective action to
prevent the discriminatory conduct alleged herein.

166.    Defendants' EEO Office failed to investigate EEO Complaints.

167.    By the acts and practices described above, Defendants have violated Plaintiff's rights and
forced her to work in a hostile work environment where she was repeatedly subjected to
unwanted physical contact and retaliation.

168.    Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's
protected rights.

169.    As a result, Plaintiff's health deteriorated, she was constructively discharged and forced
to resign.

170.    Defendant MALUF's sexual harassment is unlawful under Title VII, 1981, NYSHRL,
NYCHRL, and Plaintiff is entitled to damages as a result.

## SECOND CLAIM FOR RELIEF
## RACE DISCRIMINATION
## In Violation of
## Title VII, 1981, NYSHRL, NYCHRL

171.    Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation
set forth in the foregoing paragraphs as if fully set forth herein.

172.    Plaintiff is African American.

173.    Plaintiff was qualified for her position.

174.    Defendants MALUF and AUSTIN treated Plaintiff differently than the Caucasian

employees they managed in terms of pay, allocation of overtime and training.

175.    Defendants MALUF and AUSTIN also treated Plaintiff treated differently based on her

race at weekly staff meetings and in her day to day activities. Unlike white employees,

Plaintiff was openly yelled at and confronted by MALUF and AUSTIN at weekly staff

meetings, while white staff persons were treated professionally.  And when she wasn't being

excoriated, MALUF and AUSTIN would in the alternative ignore her comments at these

meetings.

176.    However, MALUF and AUSTIN, did not treat white staff this way.  AUSTIN would give

White staff administrative support; he would also allow them to make the same points he

fought or ignored COLLYMORE on.

177.    MALUF and AUSTIN would require Plaintiff to request overtime beforehand but did not

require Caucasian employees in the unit to request overtime in advance prior to the

implementation of the unit's overtime policy.

178.    Defendants MALUF and AUSTIN paid Plaintiff less than other white project managers

in the ECTP unit, despite the fact that she had more professional experience and more

academic credentials.

179.    By the acts and practices described above, Defendants have violated Plaintiff's rights on

the basis of her race.

180.    Defendants acted intentionally and with malice and or reckless indifference to Plaintiff's

federally protected rights.

181.    Due to the willful and deliberate actions of Defendants and as a proximate cause thereof,

Plaintiff has been denied her right to equal employment opportunity.

182.     Defendants actions described above directly and proximately have caused and continue to

cause Plaintiff to suffer: loss of income, future pecuniary losses, losses to her pension,

emotional distress, and deterioration of her health.

### THIRD CLAIM FOR RELIEF
### DISCRIMINATION
### In Violation of
### 14TH AMENDMENT
### EQUAL PROTECTION CLAUSE AND 1981

183.     Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation

set forth in the foregoing paragraphs as if fully set forth herein.

184.     Plaintiff is African American.

185.     Defendants willfully and recklessly treated Plaintiff differently based on her race, when

they publicly abused her in front of staff.  So much so that white staff members would

intervene on her behalf on multiple occasions at staff meetings.

186.     Defendants willfully and recklessly treated Plaintiff differently based on her race when

they paid her less than or at a comparable rate to other white project managers, despite her

superior educational credentials and her more extensive professional experience as a project

manager.

187.     Defendants willfully and recklessly treated Plaintiff differently based on her race when

they scrutinized her work, sabotaged her efforts to present at weekly meetings, denied her

overtime and training opportunities.  As pleaded herein, white staff under the ECTP were

given training and overtime, and their work wasn't scrutinized or sabotaged by AUSTIN and

MALUF.

188.     Accordingly, by the acts and practices described above, Defendants have violated

Plaintiff's rights on the basis of her race.

189.     Defendants acted intentionally and with malice and or reckless indifference to Plaintiff's federally protected rights.

190.     Due to the willful and deliberate actions of Defendants and as a proximate cause thereof, Plaintiff has been denied her right to equal employment opportunity.

191.     Defendants actions described above directly and proximately have caused and continue to cause Plaintiff to suffer: loss of income, future pecuniary losses, losses to her pension, emotional distress, and deterioration of her health.

**FOURTH CLAIM FOR RELIEF**
**RETALIATION**
**In Violation of**
**Title VII, 1981, 1983 NYSHRL, NYCHRL**

192.     Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

193.     Plaintiff engaged in protected activities when she made multiple complaints of discrimination against MALUF and AUSTIN to the agency's EEO Office, MALUF, KIRKS and the EEOC.

194.     Plaintiff made multiple complaints, and in each instance, she complained, either within days, or weeks she experienced adverse employment actions.  Not limited to the following, MALUF and AUSTIN: refused to pay her for work beyond her shift, changed her hours to a less desirable shift, denied her training opportunities, yelled at her on multiple occasions, attempted to bring her up on disciplinary charges, harassed Plaintiff about completing work before schedule and tried to force her to do work that was outside of her job description.

195.     By the acts and practices described above, the individually named Defendants and CITY

have retaliated against Plaintiff for engaging in protected activities in violation of Title VII, 1981, NYSHRL and NYCHRL.

196.    By the acts and practices above, the individually named Defendants named individually and in their official capacities, retaliated against Plaintiff for engaging in protected activities in violation of 1983, NYSHRL and NYCHRL.

197.    Due to the willful and deliberate actions of Defendants, and as a proximate cause thereof, Plaintiff has been and continues to be denied her right to equal employment opportunity.

198.    Defendants' actions described above directly and proximately have caused and continue to cause Plaintiff to suffer loss of income, future pecuniary losses, emotional distress, loss of enjoyment of life, and health complications.

<u>FIFTH CLAIM FOR RELIEF</u>
<u>RETALIATION</u>
<u>In Violation of</u>
<u>First Amendment and 1983</u>

199.    Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

200.    Plaintiff engaged in protected activities when she complained that AUSTIN had instructed staff to hide documents pertaining to PSAC-1, PSAC-2 and FDCAD from DOI.

201.    Plaintiff complaints about AUSTIN' directives were a matter of public concern. Between 2012 and 2016, the scandal surrounding the mismanagement of ECTP projects have been covered in the New York Daily News, the New York Times and multiple publications.

202.    Additionally, Commissioner Roest has testified on multiple occasions in front of the City Council about the issues surrounding the ECTP, the failure to produce a working PSAC-2 and corruption allegations.

203.    The ECTP has also been audited by Comptroller Liu and Mayor DeBlasio due to its

ongoing misallocation of funds and failure to deliver a fully operational PSAC-2.  A system

which would provide a backup emergency response system should the PSAC-1 be struck

during a terrorist attack or overwhelmed due to volume as was the case on September 11th.

204.    As described herein, Plaintiff experienced retaliation immediately after she complained to

DoITT management.  After multiple complaints, Plaintiff was constructively discharged and

resigned.

205.    By the acts and practices above, the Defendants retaliated against Plaintiff for engaging

in protected activities, in violation of 1983 and the First Amendment.

206.    Defendants' actions described above directly and proximately have caused and continue

to cause Plaintiff to suffer damages.

### SIXTH CLAIM FOR RELIEF
### MONELL LIABILITY
### In Violation of
### 1983

207.    Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation

set forth in the foregoing paragraphs as if fully set forth herein.

208.    At all times alleged herein, the individually named employees and named Defendants

were employed by CITY, acting on its behalf, and within the scope of their employment.

209.    At all times alleged herein, the individually named employees and named Defendants

failed to enforce the CITY's EEO Policy and Code of Conduct when Plaintiff complained

about discrimination, her hostile work environment, cronyism, retaliation and corruption.

210.    At all times alleged herein, the individually named Defendants and employees violated

Title VII, 1981 and the First Amendment when they retaliated against Plaintiff for her

complaints.

211.    Throughout Plaintiff's employ, Defendants executed official policies: where

discrimination complaints were unaddressed; where employees were allowed to retaliate against other employees for engaging in protected activities with impunity; and where employees were also allowed to retaliate against employees for reporting corruption.

212.    At all times alleged herein, the individually named Defendants possessed final decision making authority and were policymakers as defined by 1983 and the City Charter.

213.    Defendants' actions described above directly and proximately have caused and continue to cause Plaintiff to suffer damages.

**SEVENTH CLAIM of RELIEF**
**AIDING, ABETTING AND INCITING**
**In Violation of**
**NYSHRL and NYCHRL**

214.    Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

215.    By the acts and practices above, the individually named Defendants named individually and in their official capacities, have and continue to aid, abet and incite acts prohibited by New York State Executive Law § 296(6); and New York City Administrative Code § 8-107(6).

216.    Due to the willful and deliberate actions of Defendants, and as a proximate cause thereof, Plaintiff has been and continues to be denied her right to equal employment opportunity.

217.    Defendants' actions described above directly and proximately have caused a continue to cause Plaintiff to suffer damages.

218.    The facts pleaded above establish that AUSTIN, KIRKS and MALUF personally and directly participated in the deprivation of Plaintiff's rights under the law.

**VII.REQUEST FOR ATTORNEY AND EXPERT**
**FEES AND COSTS**

219.   If Plaintiff prevails she is entitled to an award of attorney and expert fees and costs

pursuant to 42 U.S.C. § 1988.


## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a. Monetary relief and damages of at least $1 million dollars;

b. Impanel a jury to hear Plaintiff's claims;

c. Costs and disbursements of this action;

d. An award of damages to compensate Plaintiff for mental anguish, humiliation, embarrassment

and emotional injury for each cause of action;

e. An award of damages in an amount to be determined upon the trial of this matter to

compensate Plaintiff for violations of her rights under Title VII, Section 1981, the New York

State Executive Law, and New York City Human Rights Law;

f. An award of punitive damages to be determined at the time of trial for each cause of action, by

reason of the wanton, unrepentant, reckless and egregious conduct of the individual Defendants

herein above alleges;

g. Directing Defendants to pay Plaintiff's attorney's fees, costs and disbursements pursuant to

Section 1981, 1988, Title VII and the City Law; and

h. Granting such other and further relief as this Court may deem necessary and proper.

## IX. DEMAND FOR JURY TRIAL

 Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

in this action.

DATED:  July 28, 2017
        Queens, New York

The Law Offices of Special Hagan

_____/s/_____

Special Hagan, Esq.
196-04 Hollis Avenue
Saint Albans, NY 11412
(917) 337-2439
*Attorney for Plaintiff*